UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GERALD CAMPBELL,

                                        Plaintiff,

            v.                                              3:10-CV-308
                                                            (LEK/ATB)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

PETER A. GORTON, ESQ., for Plaintiff
SIXTINA FERNANDEZ, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits (DIB) on April

20, 2007, claiming disability since February 1, 2001, and filed an application for

supplemental security income (SSI) on October 15, 2007, also claiming disability

since February 1, 2001.  (Administrative Transcript ("T.") at 96–101).  Plaintiff's

application for DIB was initially denied on August 6, 2007, (T. 69–72), and he

requested a hearing before an Administrative Law Judge (ALJ).  (T. 67).  Plaintiff's

SSI application filed in October was consolidated with the DIB appeal and the

hearing, at which plaintiff and his father testified, was conducted on July 28, 2009.

(T. 64, 21–62).

In a decision dated October 8, 2009, the ALJ found that plaintiff was not

disabled.  (T. 10–20).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

March 5, 2010.  (T. 1–3).

## II.    ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.    The ALJ did not properly evaluate plaintiff's credibility.  (Pl.'s Br., Dkt.
No. 11, at 5–9).

2.    The ALJ's residual functional capacity (RFC) determination is not
sufficiently specific and is not supported by substantial evidence.  (Pl.'s
Br. at 9–12).

This court concludes, for the reasons set forth below, that the ALJ properly

evaluated the medical and opinion evidence regarding the plaintiff's physical

impairments, and that there was substantial evidence supporting the RFC

determination.  The ALJ appropriately assessed plaintiff's subjective allegations of

disabling physical symptoms, and there was substantial evidence to support the

ALJ's conclusion that plaintiff's statements concerning the limiting effects of his

physical symptoms were not entirely credible.  Accordingly, it is recommended that

the judgment of the ALJ be affirmed.

## III.   MEDICAL EVIDENCE

Plaintiff's medical history involves diagnoses and treatment for a variety of

impairments relating to a seizure disorder, diverticulitis, and osteoporosis.  Plaintiff also has essential tremor, anxiety, and a history of alcohol abuse.  The medical evidence of record includes documentation of plaintiff's visits to his treating physicians[1] between 1999 and 2001, dealing with his colon polyps, ruling out ulceritive colitis, and confirming that plaintiff had diverticulitis (T. 285–88, 297–315).   Plaintiff's first seizure occurred in 2001.  (T. 181). After visiting the emergency room on November 7, 2003, for abdominal pain, he saw Dr. Ajmal Shamim for a follow-up appointment on November 13, 2003, and indicated that he had not had any seizures since he quit working at Lockheed Martin.[2] (T. 256–60). Dr. Shamim diagnosed "mild diverticulitis" and gave plaintiff the antibiotic Cipro[3] for the abdominal pain.  (T. 256).

Plaintiff saw Dr. Michele Boyle on January 5, 2004, who noted that plaintiff had been given Cipro again on January 2, 2004, to treat his abdominal pain.  (T. 249).  When plaintiff saw Dr. Shamim on February 5, 2004, his seizure disorder was described as "asymptomatic," but his abdominal pain was still present.  (T. 254). Plaintiff was given another antibiotic, Augmentin, and scheduled for a colonoscopy. (T. 254).  Plaintiff had a colonoscopy with biopsy on March 4, 2004, which found "scattered and numerous diverticula through the descending and sigmoid colon."  (T. 252).   Plaintiff had a seizure on March 29, 2004, and in his emergency room follow-

---

[1] Dr. Richard L. Blansky, Dr. Vinit K. Shah, and Dr. Ajmal Shamim are the physicians who prepared the cited medical records.

[2] Plaintiff left employment with Lockheed Martin in 2002.  (T. 222).

[3] Ciprofloxacin.

up visit with Dr. Shamim on April 4, 2004, plaintiff stated that he had been seizure-free and had thus quit taking his seizure medication for over one year prior to the seizure on March 29, 2004.  (T. 247–48, 250–51).  Dr. Shamim then restarted plaintiff on his seizure medication, Keppra.[4]  (T. 247).

Plaintiff saw Dr. Ghulam Abbas on March 9, 2005, to renew his medication and indicated that he did not have any particular complaints.  (T. 246).  Plaintiff saw Dr. Abbas on May 10, 2005, complaining of abdominal pain and discomfort.  (T. 243).  Plaintiff received a CT scan, which revealed scattered colon diverticula.  (T. 243).  Dr. Abbas noted that plaintiff denied any complaint of decreased power of any part of the body, but had recently suffered a seizure—Dr. Abbas stated that plaintiff was stable on Keppra, but suspected plaintiffs "level was altered due to Cipro."  (T. 243).  Plaintiff saw Dr. Abbas on September 23, 2005, who noted that plaintiff said that he had recently suffered a seizure which plaintiff attributed to increased anxiety.  (T. 237)  Plaintiff also complained of abdominal pain and an inability to sleep.  (T. 237).  Dr. Abbas increased his Zoloft[5] prescription and encouraged him to immediately schedule an appointment with his neurologist, Dr. Ribner.  (T. 237).

Plaintiff visited the emergency room on April 13, 2006, where he informed Dr. Abbas that he had had seizures in October 2005 and January 2006.  (T. 235).  Dr. Abbas reported that plaintiff had been out of his medication for a few weeks prior to the seizures.  (T. 235).  Plaintiff first saw his current neurologist, Dr. Taseer Minhas,

---

[4] Levetiracetam.

[5] Sertraline Hydrochloride, an selective serotonin reuptake inhibitor (SSRI) prescribed for plaintiff's anxiety and Irritible Bowel Syndrome.

on May 24, 2006, who noted that plaintiff reported having 1–2 seizures per year, with the two most recent being in October 2005 and March 2006.  (T. 181).

Plaintiff met with Dr. Daniel Galyon on December 4, 2006, for a consultation relating to left-sided rib pain.  (T. 172).  Dr. Galyon noted that had "no difficulty with lower extremity functioning at all" and that plaintiff "can forward flex and extend fairly well."  (T. 172–73).  Dr. Galyon found that plaintiff's pain was consistent with osteoporosis-induced fractures with spontaneous origin.  (T. 173).  Plaintiff had a bone scan on December 7, 2006, which noted increased areas of uptake in the right 9th and 10th ribs consistent with a healing fracture.  (T. 175).  Dr. Galyon noted after meeting with plaintiff on December 19, 2006, that he suspected an occult fracture of plaintiff's 9th and 10th ribs.  (T. 171).  A CT scan of the chest was conducted on December 21, 2006 which was unremarkable, noting that "no definite rib fractures are seen."  (T. 174).  After meeting with plaintiff on January 4, 2007, Dr. Galyon concluded that he did not think "there is anything to do here neurosurgically speaking for this man," and also noted that plaintiff "is able to get around fairly well" and that plaintiff's "pain levels at this point are quite modest." (T. 170).

Plaintiff met with Dr. Minhas on February 9, 2007, who noted that plaintiff was doing "quite well," but that he had a seizure in August 2006, while he was vacationing and forgotten to take his medication.  (T. 177–78).  Plaintiff saw Dr. Minhas again on August 10, 2007 and reported that he had a seizure in March 2007 and also in July 2007.  (T. 322).  Dr. Minhas indicated that the seizure in March 2007

was because plaintiff may have missed his medication and did not sleep well, and the seizure in July 2007 was due to flashing lights.  (T. 322–323).   Plaintiff met with Dr. Minhas on April 8, 2008, who noted that plaintiff had a seizure in October 2007, and increased plaintiff's Topamax[6] prescription.  (T. 320–21).

Plaintiff saw Dr. Minhas on July 7, 2009, and told the doctor that he had had "quite a few seizures" with the most recent occurring in March, resulting in fractured ribs.  (T. 318).  Dr. Minhas noted that plaintiff was having seizures "quite frequently," and again increased plaintiff's Topamax prescription.  (T. 319).  Dr. Minhas filled out a questionnaire for the ALJ on August 12, 2009, stating that plaintiff has frequent "complex partial seizures" and requires a rest or recovery period after a seizure, but that the duration of the rest period "varies."  (T. 316).  Dr. Minhas also indicated that plaintiff's seizures would mildly diminish plaintiff's ability to concentrate and plaintiff's ability to sustain work pace would be impaired to mild to moderate level.  (T. 316).

Further details of the medical evidence are summarized in both the plaintiff's brief (Pltf.'s Brief at 1-5) and the Commissioner's brief (Dkt. No. 14 at 2-7). Additional relevant aspects of the medical evidence are discussed below in the course of analyzing the issues disputed by the parties.

## IV.   TESTIMONY AND NON-MEDICAL EVIDENCE

Born in 1954, plaintiff was age 54 on the date of the Commissioner's decision. He received a bachelor's degree in finance and worked as a manager for IBM for

---

[6] Topiramate, an anticonvulsant.

approximately 18 years.  (*See* T. 30, 32).  In a questionnaire dated May 14, 2007, filed in connection with his disability application, plaintiff stated that his position as a manager at IBM (between 1978 and 1994) required six hours of walking and standing, two hours of sitting, two hours of reaching, and six hours of writing, typing or handling small objects each day.  (T. 115).  He did not engage in climbing, stooping, kneeling, crouching, crawling, handling, grabbing or grasping big objects.  Plaintiff frequently lifted less than 10 pounds,  and never lifted more than 50 pounds.  (T. 141).

In a questionnaire dated June 25, 2007, plaintiff stated that his position running a dry cleaning business (between 1995 and 2000) required standing, walking, and stooping the entire work day, and that he frequently lifted 30 pounds.  (T. 115, 142).  He did not engage in sitting, climbing, kneeling, crouching, crawling, handling or grasping big objects, or writing, typing or handling small objects.  (T. 142).  Plaintiff indicated that his work as a manager for Lockheed Martin (between 2000 and 2001) required sitting for six hours and walking for three hours each day.  (T. 115, 143).  He did not engage in standing, climbing, stooping, kneeling, crouching, crawling, handling, grabbing, or grasping big objects or writing, typing or handling small objects.  (T. 143).  On a document titled "Seizure Disorder Activity," plaintiff reports three seizures in 2007, four seizures in 2008, and four seizures as of June 6, 2009.  (T. 221–22).

Plaintiff testified before the ALJ on July 28, 2009.  (T. 21).  Plaintiff considered his seizures to be his most serious physical condition.  (T. 33).  He stated

7

that his most recent seizure was the day before Mother's Day, but plaintiff said that before then, he could "count on at least one a month." (T. 35). After having a seizure, plaintiff claims that "it's usually a good two days that I'm just kind of laying low." (T. 35). This period of rest is to regain his strength. (T. 37). Plaintiff testified that he takes Topamax for his seizures and tremor in his right hand, but that while the medication helps control his seizures, it does not eliminate them completely. (T. 36).

Plaintiff also testified that he has osteoporosis and diverticulitis. As to his osteoporosis, plaintiff takes Actonel and ibuprofen for the resulting back pain. (T. 38). Plaintiff testified that he had ulceritive colitis as a teenager and was diagnosed with diverticulitis in 2005 or 2006. (T. 40). Plaintiff manages the diverticulitis and his irritable bowel syndrome by taking Zoloft and watching his diet, which he testified is "working okay." (T. 40). Plaintiff testified that he began taking medication for anxiety and irritable bowel syndrome in the late 1990s. (T. 53.)

Plaintiff testified that after he left employment with Lockheed Martin, he tried to help his brother in the dry cleaning business by going in for a half day in the afternoon, but he was unable to stand for more than fifteen minutes, so he eventually stopped going after about a year. (T. 45). Plaintiff testified that he was not paid for helping his brother. (T. 45).

Plaintiff testified that the times he failed to take his medication the reason for the failure was that "more than likely, I just forgot." (T. 46). Other times he could not afford the co-payment needed to refill his prescription. (T. 46). Plaintiff further testified that he does not report to his neurologist every time he has a seizure,

because "[t]here's nothing they can do. I mean, I have the seizure and, when I call

him, he's just going to say, well, did you take a pill prior to that or . . . I [did] because

you told me to do that but I still had the seizure." (T. 49).

At the hearing, plaintiff's father testified that plaintiff takes a couple of days to

"settle down and start thinking straight again" after a seizure. (T. 58). Plaintiff's

father further testified that immediately after a seizure, plaintiff does not recognize

his father or know his own identity, but after a few hours "he starts to come around

but he's exhausted." (T. 61).

## V.    THE ALJ'S DECISION

In the ALJ's October 8, 2009 decision, she acknowledged that plaintiff met the

insured status requirements of the Social Security Act through December 31, 2006,

and found that plaintiff had not been engaged in substantial gainful activity since

February 1, 2001—the alleged onset date. (T. 15). The ALJ found that plaintiff had

two severe impairments: a seizure disorder and osteoporosis with mild compression

fractures at T9 and T10. (T. 15). The ALJ found that, although plaintiff had

diverticulitis, tremor, anxiety, and a history of alcohol abuse, these conditions did not

pose significant work-related limitations and were, therefore, not "severe." (T. 15).

She determined that plaintiff retained the residual functional capacity for light work,

except plaintiff cannot operate a motor vehicle, be exposed to hazardous equipment

or work at heights, and found that plaintiff's subjective allegations of more

significant physical symptoms and restrictions were not credible. (T. 18). The ALJ

also found that plaintiff's additional limitations have little or no effect on plaintiff's

ability to perform light work.  (T. 19).

## VI.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking DIB or SSI must establish that

he is "unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520

to evaluate DIB and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment which
> meets or equals the criteria of an impairment listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the
> [Commissioner] will consider him disabled without considering
> vocational factors such as age, education, and work experience . . . .
> Assuming the claimant does not have listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the

10

> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. § 404.1520.

The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from

performing his past work, the burden then shifts to the Commissioner to prove the

final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal

standards were applied, even if the decision appears to be supported by substantial

evidence.  *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial

factors justifying his findings with sufficient specificity to allow a court to determine

whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d

582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the

decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## VII.  ANALYSIS

### A.    Residual Functional Capacity (RFC)

The ALJ found that the plaintiff suffered from two "severe" physical impairments—a seizure disorder and osteoporosis with mild compression fractures. (T. 15).  She determined that plaintiff did not have an impairment or combination of impairments which met or equaled the relevant criteria contained in the Listing of Impairments.  (T. 16).[7]  The ALJ next determined that plaintiff retained an RFC for a

---

[7]  The ALJ specifically considered Listing Sections 1.00 (musculoskeletal disorders) and 11.00 (neurological disorders).  (T. 16).  While the ALJ did not elaborate on her analysis, the medical evidence she summarized clearly was not indicative of impairments that meet the criteria of Section 1.00 "inability to ambulate effectively on a sustained basis . . . or the inability to

limited range of light work,—*i.e.*, he was able, in an eight-hour workday, to stand and walk for at least two hours and sit for six hours; he was capable of lifting ten pounds frequently and 20 pounds occasionally.  (T. 16).  The ALJ specifically found that the additional limitations imposed by plaintiff's seizure disorder did not significantly limit his ability to perform the full range of light work.  (T. 18)

Plaintiff argues that, in evaluating the medical evidence and determining his RFC, the ALJ erred because the ALJ did not identify plantiff's functional limitations or restrictions on a function by function basis, and the residual functional capacity determination is not supported by substantial evidence.  (Pl.'s Br. at 10–11)  The ALJ must set forth the essential considerations upon which the decision was based with sufficient specificity so as to enable the reviewing court to determine whether the disability determination was supported by substantial evidence.  However, an ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  This court concludes that the ALJ appropriately considered the relevant medical evidence and opinions, and that his findings as to plaintiff's RFC, with respect to physical impairments, are supported by substantial evidence.

---

perform fine and gross movements effectively . . ."  Nor does the medical evidence establish that plaintiff met the criteria for neurological disorders in Section 11.00—"convulsive epilepsy . . . occurring more frequently than once a month in spite of at least 3 months of prescribed treatment" or "nonconvulsive epilepsy . . . occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."

Nothing in plaintiff's medical records indicates that plaintiff is unable to perform the full range of light work.  In 2005, plaintiff went to the emergency room complaining of numbness in his left foot, which was diagnosed as left peroneal nerve entrapment.  (T. 241).  Plaintiff was told to take ibuprofen and follow up with his primary care physician.  (T. 241).  On September 16, 2005, plaintiff went again to the emergency room with pain in his back just lateral to the T2 area near the scapula.  (T. 239).  When plaintiff saw his primary care physician, Dr. Abbas, on September 23, 2005, he noted that plaintiff still had some shoulder pain and neck stiffness.  (T. 237).

Plaintiff visited the emergency room on October 4, 2006, complaining of back pain, and the report indicated that plaintiff's "range of motion is decreased with twisting at the waist and bending forward."  (T. 230).  Plaintiff had a follow up visit with his primary care physician on October 16, 2006, and Dr. Abbas noted that even after taking Ultram,[8] Norflex,[9] and ibruprofen, plaintiff still complained of upper back/lower thoracic pain.  (T. 229).  Dr. Abbas ordered an MRI, which revealed compression fractures involving the T9 and T10 vertebrae.  (T. 228).  Plaintiff switched primary care physicians in January 2007, and his new doctor, Dr. Mike Choi, noted that plaintiff had been diagnosed with osteoporosis, for which he was taking Fosamax.[10]  (T. 213).

---

[8] Tramadol hydrocholoride, narcotic-like pain reliever.

[9] Orphenadrine Citrate, a muscle relaxant.

[10] Alendronate Sodium, a treatment for osteoporosis that slows bone loss.

14

Plaintiff saw a neurosurgeon on January 4, 2007, who noted that plaintiff "is able to get around fairly well," "his pain levels at this point are quite modest," and "he has no neurologic deficit of the lower extremities." (T. 170.)  When plaintiff saw his primary care physician on February 2, 2007, complaining of back pain, Dr. Choi prescribed ibuprofen 600mg every 8 hours and noted that plaintiff's back "showed good range of motion," and that plaintiff had been on the same treatment before. (T. 212).  When plaintiff met with Dr. Choi in June 2009, the doctor noted that plaintiff was taking Actonel for his osteoporosis, as well as ibuprofen. (T. 207).  Dr. Choi did not note that plaintiff was suffering from back pain, instead stating that plaintiff "denies any new complaints at this point." (T. 207).  When plaintiff visited Dr. Choi one month later on July 16, 2009, no mention was made of  back pain. (T. 206).  No doctor found that plaintiff's back pain limited his physical ability to accomplish any specific task.  These records support the ALJ's finding that plaintiff's complaints of back pain and inability to stand are inconsistent with the minimal treatment plaintiff has received for his back pain. (T. 18).

The ALJ also considered whether plaintiff's seizures constitute a nonexertional impairment that limit plaintiff's ability to perform light work.  As the ALJ noted, plaintiff has most recently received treatment for a seizure disorder from Dr. Minhas. (T. 318–19).  Dr. Minhas reported on a questionnaire that plaintiff has frequent complex partial seizures, for which he takes Topamax. (T. 316–22).  Dr. Minhas also noted that, as to work, plaintiff's medical condition would mildly[11] limit

---

[11] "Mild" is defined on the form as "function is slightly impaired creating less than a 20% diminishment in ability to function."

his concentration and mildly to moderately[12] limit his ability to sustain work pace. (T. 316).  Dr. Minhas did not evaluate whether rest periods were necessary and stated that lying down would not affect plaintiff's seizures, but also noted that plaintiff has an essential tremor that would affect his dexterity.  (T. 317).  Dr. Minhas's report is consistent with his progress report dated July 16, 2009, which indicated that plaintiff reported that he had had "quite a few seizures," noting that the last one could have been in March 2009 when plaintiff fractured his ribs.  (T. 318).  Dr. Minhas concluded that plaintiff was "having seizures quite frequently," and increased his Topamax prescription.  (T. 319).

None of the earlier progress notes from Dr. Minhas would support a finding that plaintiff's seizures would significantly limit plaintiff's ability to perform light work.  In May 2006, plaintiff reported having "maybe one or two seizures a year[13]," and Dr. Minhas noted plaintiff's essential tremor and therefore changed plaintiff to Topamax.  (T. 181–82).  Dr. Minhas's progress note dated July 28, 2006, indicated that plaintiff reported that his tremors had "significantly decreased" and plaintiff had not had any seizures.  (T. 179).  Dr. Choi made no mention of any problems plaintiff was having with seizures in January 2007.  (T. 213).  Plaintiff saw Dr. Minhas again on February 9, 2007, reporting that he had suffered a seizure in August 2006, but that his tremor had not been bothering him.  (T. 177).  Dr. Minhas concluded that the

---

[12] "Moderate" is defined on the form as "creating a limitation of function in this area of 20% or greater but not precluding the function."

[13] At the time, plaintiff's two most recent seizures occurred in March 2006 and October 2005.  (T. 181).

reason plaintiff had a seizure in August 2006, was "because he missed his medicine," and that plaintiff was "doing quite well." (T. 178). On April 13, 2006, plaintiff's primary care physician, Dr. Abbas, noted that plaintiff was "out of his medication for a few weeks before the seizures[14] happened." (T. 235; *see also* T. 230).

Plaintiff saw Dr. Minhas again on August 10, 2007, and reported to Dr. Minhas that he had been doing "quite well" other than one seizure in March 2007 and another a few weeks before meeting with Dr. Minhas. (T. 322). Plaintiff indicated that, as to the seizure in March 2007, "he may have missed his medication and he did not sleep well." (T. 322). Dr. Minhas concluded that there was "cause and affect with both the seizures," one due to noncompliance with medication and the other due to flashing lights. (T. 323). After seeing plaintiff again on April 8, 2008, Dr. Minhas increased plaintiff's Topamax prescription, noting plaintiff had suffered another seizure in October 2007, and that his tremors had recently increased. (T. 320–21). Dr. Minhas did not note any cause for the seizure in October 2007. (T. 320–21). None of the progress reports from Dr. Minhas indicate that plaintiff requires any significant rest period to recover after he suffers a seizure. These records support the finding of the ALJ that plaintiff had told his doctors his seizures occurred with a frequency of about twice a year, and that many seizures were preceded by a period of noncompliance with medication. (T. 18).

Plaintiff was diagnosed with diverticulitis in September 1999, after having a colonoscopy in which two benign polyps were removed. (T. 302–03). No evidence

---

[14] Plaintiff reported that his most recent seizures occurred in October 2005 and January 2006.

of colitis was noted.  (T. 303).  In follow up reports for visits plaintiff made for abdominal pain on November 13, 2003, and February 5, 2004, the doctor characterized plaintiff's diverticulitis as "mild."  (T. 254, 256).  Plaintiff had another polyp removed during a colonoscopy in March 2004, when the doctor noted diverticula in the descending and sigmoid colons and no evidence of active colitis.  (T. 292).  Dr. Choi made no mention of any problems plaintiff was having with his diverticulitis in January 2007, and also noted that plaintiff had not been back to see his GI doctor recently.  (T. 213).  When plaintiff was scheduled for another colonoscopy in 2008, the doctor noted that plaintiff had "occasional abdominal pain which is infrequent."  (T. 282).  During plaintiff's subsequent colonoscopy in April 2008, diverticula were again noted in the descending and sigmoid colons, and no polyps were detected.  (T. 289).  Dr. Choi did not mention any problems related to diverticulitis in his progress note related to plaintiff's visits with him on June 5, 2009, and July 17, 2009.  (T. 206–07).  These medical records support the ALJ's finding that plaintiff's diverticulitis is well-controlled through diet and has required only intermittent treatment with antibiotics.  (T. 15, 17).

The totality of the medical evidence corroborates the ALJ's RFC determination that plaintiff's seizures, diverticulitis, osteoporosis, and back pain do not result in functional limitations that prevent plaintiff from performing the specified lifting, sitting, standing, and walking requirements for light work.

**B.    The ALJ's Assessment of Plaintiff's Claims of Subjective Symptoms**

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 404.1529(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. § 404.1529(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other

treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3).

While plaintiff complained of pain, "disability" requires more than the inability to work without pain.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).  To be disabling, pain must be so severe as to preclude any substantial gainful activity.  *See* 42 U.S.C. § 423 (d)(1), (d)(5)(A).  As the ALJ found, the totality of the medical and other evidence does not corroborate plaintiff's claims regarding the extent of his pain and physical limitations.  The ALJ was not obligated to accept plaintiff's testimony about his subjective symptoms and restrictions without question, and has the discretion to evaluate credibility in light of the evidence in the record.  *See, e.g., Aponte v. Secretary, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (it is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant).  A court must uphold the Commissioner's decision to discount a claimant's complaints of pain and other subjective complaints if the finding is supported by substantial evidence.  *Id.*; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.")

Plaintiff argues that the ALJ erred by failing to take into account plaintiff's work record, which he argues bolsters his credibility.  The ALJ did not conclude that plaintiff was entirely not credible.  The ALJ rather, discounted plaintiff's testimony

as to the frequency of his seizures and his inability to stand, because, as discussed above, plaintiff's testimony in those areas contradicted the medical records and the opinions of his treating physicians.   This court concludes that there is substantial evidence supporting the ALJ's determination that plaintiff's statements concerning the intensity, duration and limiting effects of his physical symptoms were not entirely credible.  *See, e.g., Carvey v. Astrue*, 380 Fed. Appx. 50, 53 (2d Cir. June 7, 2010) (notwithstanding plaintiff's strong work history, the ALJ reasonably relied on, *inter alia*, contrary medical evidence in finding plaintiff's testimony regarding the severity of his impairment as "not entirely credible").

 **WHEREFORE,** based on the findings in the above Report, it is hereby

 **RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED**, and the complaint be **DISMISSED**.

 Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: December 20, 2010

        **Hon. Andrew T. Baxter**
        **U.S.  Magistrate Judge**